WUERPEL et al. v. COMMERCIAL GERMANIA TRUST & SAVINGS BANK.

In re SMITH BROS. CO., Limited.

(Circuit Court of Appeals, Fifth Circuit.   December 15, 1916.   Rehearing Denied January 10, 1917.)

No. 2903.

1. BANKRUPTCY ⬤═440—APPELLATE PROCEEDINGS—MODE OF REVIEW—"CONTROVERSY ARISING IN THE BANKRUPTCY PROCEEDINGS."
     Where a creditor, whose claim has been filed and allowed as a general claim, and who has received a dividend thereon, afterward files a petition to have the remainder of his claim allowed as a preferential debt and paid in full, the controversy thereon is one "arising in the bankruptcy proceeding," and the decree is reviewable by appeal under Bankr. Act July 1, 1898, c. 541, § 24a, 30 Stat. 553 (Comp. St. 1913, § 9608).
     [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 915; Dec. Dig. ⬤═440.
     For other definitions, see Words and Phrases, Second Series, Controversy Arising in the Bankruptcy Proceedings.]

2. BANKRUPTCY ⬤═293(1)—JURISDICTION OF COURT—ADVERSE CLAIM TO PROPERTY.
     A court of bankruptcy has jurisdiction to adjudicate upon a petition claiming a fund which is alleged to have come into the hands of a trustee.
     [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 411; Dec. Dig. ⬤═293(1).]

3. BANKRUPTCY ⬤═345—CLAIM TO PRIORITY—ESTOPPEL.
     A creditor, by filing a general claim, which is allowed, and on which he receives a dividend, is not estopped thereby from afterward asserting his right to preferential payment, in the absence of any showing that the trustee has been prejudiced by the delay.
     [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 531, 532, 534, 539, 540; Dec. Dig. ⬤═345.]

4. BANKRUPTCY ⬤═140(2)—PROPERTY VESTING IN TRUSTEE—EQUITIES OF THIRD PERSONS.
     To entitle a claimant to recover from a trustee money alleged to have been received under such circumstances as to render a bankrupt a trustee ex maleficio, it must be shown that the money augmented the estate held for distribution among general creditors; but proof of the receipt of the money by the bankrupt under such circumstances casts the burden on the trustee to show that the estate did not benefit thereby.
     [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 219; Dec. Dig. ⬤═140(2).]

5. BANKRUPTCY ⬤═345—CLAIMS—PRIORITIES.
     A commercial corporation assigned an account against a customer to claimant bank as collateral security for a note.   By mistake the customer remitted direct to the corporation, which deposited the draft to its credit, and on the same day used the proceeds, together with all other money it had on deposit, in payment of existing obligations, and it did not appear that it ever replaced such deposits.   It was at that time insolvent, and was afterward adjudged bankrupt.   Claimant filed its claim as a general creditor, and the same was allowed.   *Held* that, under the facts, it was not entitled to priority of payment of its claim in full over other creditors.
     [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 531, 532, 534, 539, 540; Dec. Dig. ⬤═345.]

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

In the matter of the Smith Bros. Company, Limited, bankrupt. A. C. Wuerpel and another, trustees, appeal from an order directing payment in full of the claim of Commercial Germania Trust & Savings Bank. Reversed.

See, also, 231 Fed. 934, 146 C. C. A. 130.

This was an appeal from an order confirming the report of a special master, and adjudging that the appellee be paid out of the funds in the hands of the trustee the amount of its alleged prior claim in the sum of $4,153, with interest, less a credit of $706.01, being the dividend paid appellee on its claim, which it had also filed and had allowed as an unsecured claim. After having done so, it filed a petition in the bankrupt cause for the allowance of its claim as a prior claim. The petition was by the District Judge referred to a special master, and upon his report the decree appealed from was entered.

The facts are substantially agreed upon. The bankrupts were dealers in coffee. On May 26, 1913, the bankrupts sold to J. S. Brown & Bro., of Denver, 263 bags of coffee for $4,153. They transferred to the appellee the invoice against the purchaser by a written assignment indorsed on the face of the invoice. The transfer was absolute in terms, but was intended to secure a note executed by the bankrupts to the appellee in like amount and of the same date. The purchasers were notified by the appellee, the bank, of the transfer, and of its interest in the account, and the purchasers were asked to remit direct to the appellee the amount of the invoice. On June 10, 1913, the purchasers, through error, sent a draft for the amount of the invoice to the bankrupts. The manager of the bankrupts was out of their office on the receipt of the draft, and the bankrupts' cashier deposited the draft to the credit of the bankrupts at the German-American National Bank, which collected the draft. By stipulation of the parties it was agreed that, "so far as the trustees of the bankrupt estate know, all the money in the German-American National Bank on June 10, 1913, to the credit of Smith Bros. Company, Limited, and all the money deposited in said bank after that date to the credit of Smith Bros. Company, Limited, in so far as it was checked out, was used to meet the obligations of Smith Bros. Company, Limited, and that all money in the Commercial Germania Trust & Savings Bank to the credit of Smith Bros. Company, Limited, on May 28, 1913, and all the money therein deposited after that date to the credit of said company, in so far as the same was checked, was used to meet the obligations of said company, and that Smith Bros. Company, Limited, were insolvent on June 14, 1913, when the remittance of $4,153 was received from J. S. Brown Mercantile Company." It was also shown that on June 14, 1913, the bankrupts were overdrawn at the close of business with the German-American National Bank, with the Hibernia National Bank, and that there was a general debit balance against them, taking into account the balances and overdrafts, at all the banks at which they did business, of about $4,000. There were other facts in evidence, not necessary to be set out.

Charlton R. Beattie, of New Orleans, La., for appellants.

Edwin T. Merrick and Ralph J. Schwarz, both of New Orleans, La., for appellee.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge (after stating the facts as above). The record presents three questions of practice and procedure, and one of substantive right.

[1] 1. The case is brought to this court by appeal, and the appellee contends that the appeal was taken more than 10 days from the date of the judgment appealed from, and should be dismissed because taken too late. The appellee contends that the appeal must be taken under section 25a, contending that the judgment appealed from was one "allowing or rejecting a debt or claim of $500 or over." The appellant contends that the appeal was allowed under section 24a, which invests Circuit Courts of Appeal "with appellate jurisdiction of controversies arising in bankruptcy proceedings from the courts of bankruptcy from which they have appellate jurisdiction in other cases," and that time for taking the appeal was 6 months.

In view of the fact that, prior to the time of the filing of the petition on which the order appealed from was made, the appellee's claim had been allowed in full as an unsecured claim, and that the trustee makes no complaint of its allowance in full as an unsecured claim, but has paid a dividend of 17 per cent. on it as such, we think it clear that the appeal by the trustee is not taken from a judgment allowing a claim under section 25a. The petition was filed with the District Judge, and by him referred to a special master. Its prayer was to be allowed full payment of its already allowed unsecured claim, as a prior claim, and this was the relief granted.

In the case of Hewit v. Berlin Machine Works, 194 U. S. 296–299, 24 Sup. Ct. 690, 691 (48 L. Ed. 986), the Supreme Court said:

"If the trustee had carried the case to the Circuit Court of Appeals on petition for supervision and revision under section 24b of the Bankruptcy Law, the case would have fallen within Holden v. Stratton, 191 U. S. 115 [24 Sup. Ct. 45, 48 L. Ed. 116], and the appeal to this court would have failed. But he took it there by appeal, though accompanied by some apparent effort to avail himself also of the other method. And as the Berlin Machine Works asserted title to the property in the possession of the trustee by an intervention raising a distinct and separable issue, the controversy may be treated as one of those 'controversies arising in bankruptcy proceedings,' over which the Circuit Court of Appeals could, under section 24a, exercise appellate jurisdiction as in other cases. Section 25a relates to appeals from judgments in certain enumerated steps in bankruptcy proceedings, in respect of which special provision therefor was required (Holden v. Stratton, supra) while section 24a relates to controversies arising in bankruptcy proceedings in the exercise by the bankruptcy courts of the jurisdiction, vested in them at law and in equity by section 2, to settle the estates of bankrupts and to determine controversies in relation thereto."

Hewit v. Berlin Machine Works was a controversy relating to the ownership of certain machines claimed by both the trustee and vendor. In this case, the controversy is as to the ownership of a fund claimed by both the trustee and the appellee. It is entirely separate from the matter of the allowance of the claim, and so is not governed by Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008, and Matter of Loving, 224 U. S. 183, 32 Sup. Ct. 446, 56 L. Ed. 725. Nor was it partially connected with the allowance of a claim, presenting in addition the question of a right to a lien, dependent upon a pure question of law, as in Huttig Sash & Door Co. v. Stitt, 218 Fed. 1, 133 C. C. A. 641. On the contrary, it is a proceeding entirely independent of any question as to the allowance or rejection of a claim, but is a controversy arising in the bankruptcy

proceeding. The appeal was properly taken under section 24a, and the time for perfecting it was 6 months from the date of judgment.

[2] 2. The trustee asserts that the bankrupt court was without jurisdiction to hear the petition because he contends the fund being litigated about never reached the trustee, and could not be said to be in his possession, when the appellee's petition was filed. However, if the appellee is entitled to any relief, it is on the theory that the amount claimed in the petition did reach the trustee in some form. If the fund was in the possession of the trustee when the petition was filed, then the bankruptcy court had jurisdiction to determine all claims asserted against it. The face of the petition filed by appellee showed the controversy to have been one within the jurisdiction of the bankrupt court. It is not, therefore, a case where the claimant would be required to sue the trustee in a plenary suit in the state court under section 23a. A determination that the fund in controversy never reached the estate in bankruptcy in any form would necessitate a decision for the appellant on the merits, as well as upon the jurisdictional question.

[3] 3. The trustee also contends that the fact that appellee filed an unsecured claim for the amount here in controversy, which was allowed and on which it received a dividend, without asserting any right of priority, operates as an estoppel against its now asserting any such priority. The record does not show that the trustee was in any way induced to change his position by the act of appellee. It does not show that he has paid out funds for costs or dividends that he would have retained for the satisfaction of the appellee's prior claim, had he been advised it was to be asserted. Nor does it appear that the trustee was injured by delay in asserting the alleged priority of appellee's claim in the way of making his proof or otherwise. In the absence of such a showing, we do not think the estoppel can be sustained. Wallace v. Stone, 107 Mich. 190, 65 N. W. 113.

[4] 4. The last question is whether the record shows the appellee to be entitled to a priority in payment of its claim over unsecured creditors. The claimed right is predicated upon the theory that the bankrupts in receiving and using the draft, which it had in equity assigned for value to the appellee, became a trustee ex maleficio for the appellee, entitling it to follow the fund, as far as it was traceable, and recover it for the satisfaction of its claim. Two things are necessary to entitle appellee to the relief it asks. The draft must have been received and cashed by the bankrupts under circumstances which would make them trustees in invitum, and of this proposition there can be no doubt from the admitted facts contained in the record. The second requisite is that the estate in bankruptcy was augmented or benefited by the fund arising out of the collection of the draft by the bankrupts. The law is well settled that such augmentation of or advantage to the bankrupt estate must arise from the transaction; otherwise, the injured person fails to trace the fund into the assets of the insolvent or bankrupt estate, and, failing to do so, ranks only as an unsecured creditor, along with all others. If it be shown that the injured person contributed nothing to the assets for distribution among common creditors, by the fund or property he lost to the insolvent or bankrupt, then there is no

equity in allowing him to withdraw from the fund for such distribution an amount he never added thereto. The equity depends upon the effect which the property or money of the injured person had in swelling or increasing that fund. It is not right that what was wrongfully obtained by the bankrupt from the injured person should be divided among his creditors, who were not victims of the wrong done. The equity depends upon the fact of such division of the property of the injured person. If it be shown that there was in fact no property of the injured person that went to the insolvent estate for division among creditors, then it would be inequitable to take from creditors that which belonged to them, and not to the injured person, and give it to the injured person.

A wrong done the injured person by the insolvent is not sufficient in itself to establish the right to priority. Profit resulting from the wrong to creditors must also exist. The amount of such profit is the amount the injured person is entitled to reclaim from the fund for distribution. If it be shown that no increase has resulted to the fund for distribution, then no profit results to the creditors, and there is no equitable reason for a reclamation by the person wronged. It is also true that the advantage or increase must be to the fund for distribution among creditors, and not to the insolvent or bankrupt himself. It is quite clear that if the insolvent or bankrupt is shown to have dissipated the fund obtained by his wrong to his personal use, and in a manner that adds nothing to the amount of his assets that come to his assignee or trustee, then his creditors profit nothing by the transaction. If the identical property or money obtained from the wrong person by the bankrupt was immediately lost by him, in specie, in gambling or by any other means, which added nothing to his property or estate, and so did not augment the assets that came into the hands of his assignee or trustee, when he was declared insolvent or adjudged bankrupt, it is clear that the wronged person could not trace his property or money into a fund, into which they had concededly never entered in any shape. It would then not be a question of identifying the property in that fund, for the property never would have been a part of the fund. It is also true that, though the property or money, obtained by the wrong of the bankrupt, entered the estate of the bankrupt before bankruptcy, but can be indubitably shown to have departed from it, before bankruptcy, in the sense that the creditors of the bankrupt could not benefit from it, on distribution, there can exist no reason for depriving the creditors of what they would otherwise have received on distribution, because of a wrong of the bankrupt through which they profited nothing.

[5] Coming to apply this principle to the instant case: There is no doubt that the Smith Bros. Company, Limited, received the $4,153, the proceeds of the draft which should have gone to appellee. Having received them, they are presumed to have augmented the estate that came to the trustee in bankruptcy, unless the contrary is affirmatively shown by the record. The trustee must satisfy the court that he received no part of the proceeds of the draft, and that the unsecured creditors, represented by him, got no benefit therefrom. If the evi-

dence had shown that the officer of the bankrupt, who handled the draft, had appropriated its proceeds to his individual use, the absence of benefit to both the bankrupt and its creditors would be apparent. In that event no part of its proceeds could have swelled the assets of the estate in bankruptcy. In this case the evidence and the stipulation show that the proceeds of the draft did go to the credit of the bankrupt corporation; it also shows, as we understand the stipulation and the concession in the printed brief for the appellee, that it was paid out by the bankrupt in satisfaction of its existing obligations, and that this happened on June 14, 1913, the day the bankrupt received the draft. It was deposited to the credit of the bankrupt with the German-American National Bank on that day. All funds at that bank were withdrawn by it before the close of business on that day. Some of the checks withdrawing funds from the German-American National Bank were drawn in favor of the Hibernia National Bank. However, that this was not a mere transfer of funds from one bank to the other is made apparent by the fact, shown by the record, that the bankrupt was overdrawn, at the close of business of the same day, at the Hibernia National Bank as well. It must, therefore, have employed all the funds there deposited from the German-American National Bank for the payment of its existing obligations. It is also shown that, at the close of business on the same day, the bankrupt had no credit balance in the aggregate at all the banks with which it dealt.

It is not claimed that the proceeds of the draft went into the purchase of new goods, but, on the contrary, that they went entirely to reduce existing obligations. That this was a benefit to the bankrupt is obvious. The test, however, is whether it was of interest to the general creditors, by swelling the fund or assets that came to the trustee for distribution among them. If new goods had been bought by the bankrupt with the proceeds of the draft, which went into its general stock, and presumably remained there till surrendered to the trustee, or if there had remained, at all times till bankruptcy intervened, a balance to the credit of the bankrupt, at any or all of the banks with which it did business, an amount in which the proceeds of the draft might be represented, an augmenting of the assets that came to the trustee would be shown. The stipulation and record affirmatively show that no such use was made of the proceeds of the draft, but that, on the contrary, they were used exclusively to pay existing obligations, and added nothing to the property or money that went to the trustee in bankruptcy. Unless it can be said that paying some debts benefits the creditors not paid, no benefit results in this case. If the draft had been indorsed by the bankrupt to a single creditor, to whom it owed a like amount, it is clear that the other creditors of the bankrupt could not have been benefited by such payment, in the full amount of the draft, since the creditor paid would only have depleted the assets on distribution in bankruptcy, to the extent of the dividend paid by the estate, which in case of insolvency would be less than the full debt. The benefit, resulting to the estate in bankruptcy, would lie solely in the amount of the dividend that

payment of the creditor paid in full before bankruptcy, avoided the necessity of paying out of the assets. This, then, is all that should be, in that event, taken from the creditors, since it represents the full benefit received by them from the payment to the bankrupt.

In the instant case, the concession is that the proceeds of the draft were paid out to existing creditors. The differences between the suggested case and this case would lie only in the increased difficulty of showing that the fund was dissipated before reaching the trustee; but this becomes unimportant in view of the concession. In this case there is also this difference from the illustration. The appellee has filed a claim as an unsecured creditor in the full amount of the proceeds of the draft it was entitled to, which has been allowed, and has received and will receive upon it the full dividend paid to other creditors. This would have been the extent of the liability of the estate to the creditors, whose obligations were paid in full, had they not been paid, but had filed claims. In that event, no claim would have been filed by the appellee. So that, in this case, the record shows that the unsecured creditors received no benefit from the receipt of the proceeds of the draft by the bankrupt, either in increased assets or reduced liabilities. The only difference is in the personnel of the claimants who filed the claim, which is immaterial to the creditors participating in the distribution.

Nor can it be said that the obligations paid with the proceeds of the draft would have been paid out of other funds of the bankrupt on deposit on June 14, 1913, and must be referred to those other sums, upon the principle that the bankrupt would have first used the funds it had the right to use for that purpose. The record shows an exhaustion of all its funds, subject to check, in all banks with which it had an account, upon the closing of business on that day. It cannot be presumed that an overdraft would have been permitted in so large an amount. The presumption is, therefore, overcome by the proof that claims in the amount of the proceeds of the draft were paid on June 14, 1913, and that the bankrupt had no funds with which to have paid them, other than the proceeds of the draft. So it affirmatively appears that the proceeds of the draft went into and out of the estate of the Smith Bros. Company, Limited, the bankrupt, on June 14, 1913. Unless replaced between that date and June 26, 1913, when there was, in effect, a general assignment made by the Smith Bros. Company, Limited, the fund for distribution among creditors did not profit by them. The record contains no evidence of such replacement. The misappropriation of the proceeds of the draft does not appear to have been discovered until June 26, 1913, and there could have been no intentional replacement. The bankrupt was insolvent June 14, 1913. The record does not satisfactorily show how much money, if any, the bankrupt had to its credit on June 26, 1913. It does show large collections by the liquidators between that date and the filing of the petition in bankruptcy, which were turned over to the bankrupt court. The proceeds of the draft, of course, did not enter into such sum. While the burden is on the trustee to show that the proceeds of the draft went out of the estate

of Smith Bros. Company, Limited, before the assets of that company were taken possession of by creditors, we do not think that the trustee, having shown their departure, would also have the burden of showing that they did not again re-enter the fund that went to creditors upon insolvency.

The view of the law we have expressed is sustained by the decisions. In the case of City Bank v. Blackmore, 75 Fed. 771, 773, 21 C. C. A. 514, 515, Circuit Judge Taft, for the Court of Appeals for the Sixth Circuit said, after holding that the record showed a case for the allowing of a priority of payment, if the fund for disposition among creditors was shown to have been enhanced:

"The sole question is, therefore, whether the credit thus secured to the Commercial Bank and its receiver by the draft entitled the City Bank to take $5,000 out of the assets held by the receiver. The question must certainly be answered in the negative, in any view which can be taken, unless it appears that the assets were increased $5,000 by the credit, or that the claims against them were so decreased that there was $5,000 more for distribution among those who remained creditors after the credit than there would have been, had no credit been given to the Commercial Bank for the draft. This does not appear. If no such credit had been allowed by the National Bank of the Republic, it would merely have been a claimant for $5,000 more, and would have been entitled, not to $5,000 in full, but only to pro rata dividends on that amount. The benefit to the general fund from the draft, therefore, is limited to the amount of the dividends payable on $5,000, and that amount the receiver has already allowed to the City Bank. It has no ground for complaint, therefore. No authority has been cited to show that a claim founded on fraud is entitled to a priority over other claims. It is only where, by the rescission of the contract out of which the claim arises, on the ground of fraud, the specific thing parted with or its proceeds can be sufficiently identified to be returned, that fraud seems to give a priority of distribution. It may not be necessary to show earmarks upon the proceeds of the thing parted with to justify such a remedy, but it must at least appear that the funds in the hands of the receiver were increased or benefited by the proceeds, and the recovery is limited to the extent of this increase or benefit. In every case relied upon by counsel for appellant, recovery, if decreed, was based on the fact that the property in the hands of the assignee or receiver of the person or bank against whom the claim of fraud, right to rescind, and priority of distribution was made, included in its mass either the very thing parted with or its proceeds. Railroad Co. v. Johnston, 133 U. S. 573, 10 Sup. Ct. 390 [33 L. Ed. 683]; Armstrong v. Bank, 148 U. S. 50, 13 Sup. Ct. 533 [37 L. Ed. 363]; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537 [52 Am. Rep. 9]."

In the case of Frelinghuysen v. Nugent, 36 Fed. 229–239, Justice Bradley, for the Circuit Court for the District of New Jersey, said:

"Another difficulty in the complainant's case is the want of identity of the property claimed with the proceeds of the money abstracted from the bank. Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried. The difficulty of sustaining the claim in the present case is

that it does not appear that the goods claimed—that is to say, the stock on hand, finished and unfinished—were either in whole or in part the proceeds of any money unlawfully abstracted from the bank. On the contrary, the goods and stock on hand were purchased of the other creditors of Nugent & Co. almost entirely, if not wholly, on credit, and really stand in the place of, and represent the debts of, the firm due and owing to said creditors. This is true with regard to all the raw stock on hand, and with regard to all the stock and materials from which the manufactured or partially manufactured goods were produced. If any moneys derived from the bank entered into the latter, they were those moneys which were regularly drawn by checks of the firm weekly for the payment of their hands. It seems impossible therefore, to sustain any such general charge or trust upon the goods and property of Nugent & Co. as that which has been set up and claimed by the complainant."

In the case of Boone County Bank v. Latimer (C. C.) 67 Fed. 27, the court said on page 27:

"The difficulty in sustaining the complainant's claim is that the agreed statement of facts does not show that the sum of $1,500, collected by the Sedalia bank for the complainant bank, stood mingled with other moneys of the insolvent bank on hand at the time the bank passed into possession of the receiver. On the contrary, the statement is that between the time of the collection of the money by the bank and the succession of the receiver the bank had collected various other sums of money, and distributed the whole sums collected by it, with the exception of $495.29. So that neither the whole sum collected by it for the complainant was on hand in kind, nor other moneys of the bank to that amount with which it had been mingled. That was precisely the reason given by the courts in the two cases above cited for refusing the relief asked. It did not appear 'that the goods claimed were either in whole or in part the proceeds of any money unlawfully abstracted from the bank,' and because the property against which it was sought to enforce the lien was bought from other creditors. While the agreed statement of facts recites that since the receiver took possession he has realized large sums of money from the assets of the bank, no inference is permissible that such assets were the product, in whole or in part, of the money collected for the Boone County Bank. It is true that the general assets of the bank were augmented to the extent of the absorption of the $1,500 diverted from the rightful owner; but in the absence of proof that the trust fund constituted a part of the remaining assets, so converted into money by the receiver after his succession, I feel constrained by the limit to the equity rule established by the federal Supreme Court not to extend the lien to the general estate."

The general doctrine that the estate in insolvency must have been augmented by the fund sought to be recovered is well settled, and seems not to be disputed. Its application to the facts of this case is the disputed question. The authorities cited are most in point upon the proper application of the rule to the facts shown by the record. Following them, we think that the record affirmatively shows that the insolvent estate, which was to be administered in bankruptcy for the benefit of the creditors of the bankrupt, did not profit from the proceeds of the converted draft in any respect, and that when this affirmatively appears the injured or defrauded party is no more than an unsecured creditor, entitled to no priority, since it is not the character of the wrong done him alone, but also the fact of advantage received by other creditors thereby, that entitles him to such priority.

The decree of the District Court, adjudging that the appellee was entitled to be paid in full out of the assets of the bankrupt estate, is reversed, and the cause remanded to the District Court, with directions that the petition of the appellee be dismissed.