BANK OF RAGLAND v. HUDSON.

In re RAGLAND BRICK CO.

(Circuit Court of Appeals, Fifth Circuit.   January 7, 1918.)

No. 3155.

1. BANKRUPTCY ⬤⟞461—CONTROVERSIES—APPEAL.

An appeal from an order sustaining the petition for permission to remove brick manufactured in the plant of bankrupt by its lessee, which was opposed by a bank, which made advances under a contract with the bankrupt and its lessee, falls within Bankruptcy Act July 1, 1898, c. 541, § 24a, 30 Stat. 553, allowing appeals in controversies in bankruptcy, the time for perfection of which is six months, instead of section 25a, requiring appeals in bankruptcy proceedings to be taken within ten days after rendition of the judgment or order appealed from; it appearing that the petitioner claimed the brick by bill of sale, and the decision involved the construction of the contract entered into between the bank, the bankrupt, and its lessee.

2. CONTRACTS ⬤⟞194—CONSTRUCTION—LIEN.

The bankrupt, which had owned and operated a brick plant, having demised its plant, entered into a contract with a bank, whereby the bank agreed to make advances to the lessee to enable it to manufacture brick. The contract further provided that the bank should have a lien on all brick manufactured during each month, but authorized the bankrupt to sell the brick manufactured each month, and to make monthly settlements. *Held,* that one who purchased the brick manufactured in the months preceding the month in which the lessee ceased operations is entitled to such brick as against the bank, even though the brick manufactured during the last month in which the lessee abandoned operations was insufficient in value to repay advances made during that month; it being obvious that, as the bank contemplated regular monthly disposal of the product, its lien for advances in any month could not extend back to brick already released.

Appeal from the District Court of the United States for the Southern District of Georgia; Emory Speer, Judge.

In the matter of the bankruptcy of the Ragland Brick Company, in which R. M. Hudson intervened, petitioning for permission to ship certain bricks and for order that the trustee show cause. The Bank of Ragland also intervened, praying dismissal of the petition. An order of the referee in favor of the petitioner having been upheld by the District Court, the Bank of Ragland appeals. Affirmed.

This was an appeal from an order of the District Court for the Southern District of Georgia, affirming an order made by the referee in bankruptcy upon the intervention of appellee, R. M. Hudson, claiming a fund representing the proceeds of the sale of certain brick, which had been delivered to and sold by the appellee under a stipulation between him, the appellant, and the trustee in bankruptcy. The appellant and appellee each claimed title to the brick—the former by virtue of a chattel mortgage agreement, executed on November 11, 1913, by the bankrupt, one N. W. Quillin, its lessee, and the appellant; the latter by virtue of a sale agreement and bills of sale executed to it by the bankrupt. The referee determined appellee's title to be superior, and the District Judge affirmed his conclusion, and from the order of the District Court this appeal is taken.

The facts, so far as necessary to be stated for a proper consideration of the merits of the case, are as follows:

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

247 F.—16

The Ragland Brick Company, a corporation of Bibb county, Ga., was adjudged a bankrupt on April 21, 1915. In due course, W. E. Martin, Jr., was elected trustee. The company owned and had been operating a brick plant at Ragland, in the state of Alabama. In October, 1913, it leased its plant to N. W. Quillin for a period of six months. The lease was subsequently renewed for an additional period of six months. The plant was operated by the lessee until some time in August 1914, when the lessee ceased to manufacture brick. At that time there was on the yard a large number of brick; several kilns of brick in process of manufacture, but had not been burned. This was the situation at the time the trustee took charge in May, 1915. In addition to the brick, the bankrupt company owned considerable real estate and equipment, which after numerous efforts of the trustee have been sold for the sum of $7,500. Contracts were made by the brick company—one with Quillin, who was to manufacture brick and sell the output to the brick company; the second with Quillin and the Bank of Ragland, under which the bank was to advance to Quillin moneys to be used in the payment of pay rolls and other expenses in manufacturing brick, and the brick company was to release its claim on the brick during the process of manufacture, and to pay to the bank a sum sufficient to discharge the indebtedness due the bank by Quillin when the brick had been manufactured and placed on the yard; and the third contract was with R. M. Hudson, by which the brick company sold to Hudson the output of the plant for the sum of $15 a thousand for No. 1 paving brick, payment to be made monthly. At the time of bankruptcy, Hudson had paid for more brick than were stacked on the yard for delivery to him, and Quillin was indebted to the bank in the sum of $3,000, with interest from September 20, 1914. The bank claimed title to the brick in process of manufacture and to 300,000 of the brick on the yards, or a sufficient number thereof to pay its indebtedness. R. M. Hudson was permitted by the referee to take possession of the brick on the yards, upon giving a bond to protect the bank in case the latter's claim should be held to be superior to Hudson's claim. The brick in process of manufacture have been sold, and of the proceeds $417.07 were turned over to the bank, and the proceeds of other brick, amounting to $1,000, have been paid to the bank, leaving a balance now due the bank of $2,034.64.

The contract between the Ragland Brick Company, N. W. Quillin, and the Bank of Ragland, entered into on November 11, 1913, provided in substance that Quillin should proceed at once with the manufacture of paving brick, and manufacture and place on the yards 300,000 No. 1 paving brick; that as soon as 300,000 brick were so placed the Ragland Brick Company should pay to the Bank of Ragland $3,000, to be applied on the indebtedness due by Quillin, lessee, to the bank for moneys advanced to him by the bank to pay labor and other expenses of Quillin in the manufacture of brick; that in the meantime, and until 300,000 brick were manufactured, the brick company released to the bank its claim on the brick in the process of manufacture; that this course of dealing was to be repeated monthly; that Quillin was to keep at all times as near as possible 400,000 brick in process of manufacture, and as near as possible 300,000 No. 1 paving brick stacked on the yards; and that the loan to Quillin should at no time exceed $3,000. On the occasion of each monthly settlement, title to the No. 1 paving brick manufactured during the previous month passed out of Quillin, the lessee, and the brick became the property of the Ragland Brick Company, and thereafter the latter made a bill of sale to Hudson under the contract with Hudson, and they thus became Hudson's property. The Bank of Ragland was dealing with Quillin as lessee, but had knowledge of the fact that the Ragland Brick Company was selling its output of No. 1 brick to some one.

The contract of November 11, 1913, is as follows:

"The State of Alabama, St. Clair County:

"Know all men by these presents, that whereas, the undersigned, Ragland Brick Company, a corporation, by its president, Jesse H. Hall, and by authority of the board of directors, and N. W. Quillin, in his own proper person, and the Bank of Ragland, a corporation, by its president, W. T. Brown, and by authority of its board of directors, have this day and by these presents

entered into this contract, and on the consideration and mutual promises and covenants hereinafter contained and set forth, to wit:

"On October 20, 1913, the Ragland Brick Company leased to N. W. Quillin for a period of six months its brick plant situated and located in the town of Ragland, in said state and county, including all of its real and personal property pertaining to the manufacture and shipments of brick, and placed the said N. W. Quillin in possession of same, with all the rights and privileges connected therewith, except the reservations hereinafter named and set forth. The said N. W. Quillin is to proceed at once with the manufacture of paving brick at said plant, said paving brick to come up and to be subject to the standard specifications and tests of the various Southern cities. The said N. W. Quillin is to manufacture and place on the yard of the brick plant not less than three hundred thousand (300,000) of No. 1 pavers of the quality and such as will stand the test named above. Immediately when three hundred thousand No. 1 paving brick have been placed on the yard, the Ragland Brick Company covenants and agrees to pay to the Bank of Ragland the sum of three thousand ($3,000) dollars for the account of the said N. W. Quillin, this fund to be applied to any indebtedness that may be owing to the said Bank of Ragland by the said N. W. Quillin. Until the manufacturing and placing on the yard of the three hundred thousand brick named above, the Ragland Brick Company hereby transfers to the Bank of Ragland its lien and title in said brick to secure the said Bank of Ragland for any advance made to the said N. W. Quillin, while the brick are being manufactured and placed on the yard.

"During the period covered by said lease, the said Ragland Brick Company releases to the Bank of Ragland its lien and title on all brick in process of manufacture, and on the 20th of each month the said Ragland Brick Company agrees to pay to the said Bank of Ragland nine ($9) dollars per thousand for all No. 1 paving brick shipped or stacked on the yard during the preceding month, and this arrangement to continue and be repeated during the six months covered by said lease, and the Ragland Brick Company binds itself, its successors and assigns, to the faithful performance of their part of the contract.

"In case three hundred thousand (300,000) brick of No. 1 paving quality should not be placed on the yards, the said N. W. Quillin binds himself to deposit with the Bank of Ragland the difference between the value of the No. 1 paving brick so piled, figured at $9 per thousand, and the total amount of money advanced to the said N. W. Quillin by the said Bank of Ragland.

"After the first lot of 300,000 No. 1 paving brick have been manufactured and placed on the yard, the said N. W. Quillin shall continue to carry on the business of making paving brick at said plant during the period covered by the said lease between the said N. W. Quillin and the said Ragland Brick Company, and the title and lien mentioned above shall automatically cover and attach to all brick in the process of manufacture, or that may be manufactured, shipped, or piled on the yard, and the said N. W. Quillin agrees to bind himself to keep as near as possible at all times not less than four hundred thousand (400,000) brick in the process of manufacture, and as near as possible three hundred thousand (300,000) No. 1 pavers on the yard, and the title to all brick in process of manufacture shall be and vest in the said Bank of Ragland to the right of the bank, and in the event that said N. W. Quillin should fail to comply with his contract with the said Bank of Ragland the said Bank of Ragland will have the right to complete the process of manufacture of said brick, and the said Ragland Brick Company agrees to carry out its contract; and in this event the Ragland Brick Company agrees to carry out with the Bank of Ragland its contract with N. W. Quillin, and pay to the Bank of Ragland all moneys earned under said contract between the said N. W. Quillin and the said Ragland Brick Company.

"The subsequent advancements to be made by said bank to the said N. W. Quillin under the terms of this agreement every two weeks for pay day, and then not to exceed at any time the equity of said N. W. Quillin in said brick, viz. $9 per thousand, f. o. b. cars or stacked on the yard; that if the said N. W. Quillin shall fail or refuse to comply with his part of the agreement, or

the renewal thereof, for or on account of any money received by him from said Bank of Ragland, then the said Bank of Ragland shall have the right to take possession and control of the property, and the Ragland Brick Company will pay to the Bank of Ragland, for all brick delivered to them, the same as they have agreed to pay to the said N. W. Quillin, and from the proceeds arising from such sale of brick by the Bank of Ragland to the Ragland Brick Company the Bank of Ragland will apply same to the payment of any and all sums of money which may be due said Bank of Ragland by the said N. W. Quillin; and the remainder, if any, arising from such sale, will be paid to the said N. W. Quillin. The said N. W. Quillin is to make daily reports to the said Ragland Brick Company of brick manufactured and will make weekly reports to the said Ragland Brick Company and to the Bank of Ragland of all paving brick finished and shipped, or placed on the yard ready for shipment, and also the number of brick in process of manufacture or making, and which, under the terms of this agreement, are subject to the lien of said Bank of Ragland.

"The parties to this agreement mutually bind themselves to pay each other any damages which either one of them may sustain by reason of their failure to comply with the terms of this agreement.

"It is further understood and agreed that is [if] at the end of six months from October 20, 1913, the said N. W. Quillin desires to renew this contract with the Bank of Ragland for another six months, he shall have the right to do so, under the terms of this agreement, provided the said N. W. Quillin is not in default under this contract. It is further understood and agreed between the parties hereto that if on the termination of this contract, or on termination of any renewal thereof, the said N. W. Quillin is or shall be indebted in any sum whatever to the said Bank of Ragland on account of any money advanced him or loaned him for pay roll, or used to pay expenses of the manufacture of brick, the Ragland Brick Company guarantees the payment to the bank of any and all amounts due by the said Ragland Brick Company to the said N. W. Quillin, and the said N. W. Quillin hereby assents and directs the said Ragland Brick Company to pay to the said Bank of Ragland any amount which may be due him at the time of such default.

"It is further understood and agreed by all parties that at no time the bank's loan will exceed more than three thousand ($3,000) dollars, and that at all times there must be on yard and in process of manufacture brick of the quality as above described and agreed upon to cover any amount that might be due the Bank of Ragland any time.

"A copy of such lease of date of October 20, 1913, between the Ragland Brick Company and the said N. W. Quillin is hereto attached and made subject to all modifications and changes contained in this contract and agreement.

"In witness whereof, the Ragland Brick Company, by its president, and under its corporate seal, has hereto affixed its corporate name; the Bank of Ragland, by its president, has hereto affixed its corporate name and seal; and the said N. W. Quillin has hereto affixed his name on this 11th day of November, 1913.    Ragland Brick Company,

"[Signed]    J. H. Hall, President.

"The Bank of Ragland,

"[Signed]    Watt T. Brown, President.

"[Signed]    N. W. Quillin."

T. B. Higdon, of Atlanta, Ga., for appellant.

Aldine Chambers, of Atlanta, Ga., Louis G. Smith, of Macon, Ga., and M. F. Goldstein, of Atlanta, Ga., for appellee.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge (after stating the facts as above). [1] A motion to dismiss the appeal was submitted at the time of the sub-

mission on the merits. It was based upon the fact that the appeal was not taken within ten days from the date of the order appealed from, the contention being that it was an order allowing or rejecting a claim under section 25a of the Bankrupt Act. We hold, in conformity with our decisions in the case of Wuerpel v. Commercial Germania Trust & Savings Company, 238 Fed. 269, 151 C. C. A. 285, following the case of Hewit v. Berlin Machine Works, 194 U. S. 296–299, 24 Sup. Ct. 690, 48 L. Ed. 986, that the appeal was not taken under section 25a, but from an order in a controversy arising in bankruptcy proceedings from a court of bankruptcy under section 24a, and that the time for perfecting the appeal was six months from the date of the order appealed from. In view of the circumstances under which the delay in filing the transcript of the record here is shown to have occurred, we are not disposed to dismiss the appeal for this cause. The motion to dismiss is overruled.

[2] The decision of the case, as we see it, is controlled by the construction of the contract between the bankrupt, the Ragland Brick Company, the Bank of Ragland, the appellant, and N. W. Quillin, the lessee of the bankrupt of the brickyard at which the brick involved were made, and which was executed November 11, 1913, and which is set out in the statement of facts. Appellant contends that this contract gave it a lien on all brick in the possession of the bankrupt or its lessee, and stored on the brickyard, whensoever made. Appellee contends that the bank's lien covered brick in process of manufacture and such as were made and shipped during each month of the lease, only until the amount advanced by the bank to the lessee for the making of each month's output had been repaid it, and then ceased. It was conceded that the part of the fund in controversy arose from the sale of brick made prior to the last month's operation of the plant, for the advances on which the bank had been paid. The bank received the amount representing all brick sold that were made from advances made by it for the last month's operation, but not enough brick were made and sold during the last month's operation to reimburse the bank for the amount advanced the bankrupt's lessee during that month, and it seeks to collect the balance of its advances by going back to brick that had been made in previous months but still remained on the yard when bankruptcy intervened. These brick were covered by appellee's bills of sale, executed under his agreement with the bankrupt to purchase the monthly output of the bankrupt, which it, in turn, had bought from its lessee. The question of the respective priority of right of the appellee under his bills of sale, and of the appellant under its mortgage agreement, depends upon whether appellant retained any lien on brick made and stacked on the bankrupt's yard after the appellant bank had received its current monthly advances to the bankrupt out of the current monthly output of brick.

It appears from the record that the bankrupt and its lessee were unable to finance the current operations of the brickyard and had no security to offer for that purpose, other than the brick made out of the funds advanced for the cost of their making. Each month's expenses must be paid out of each month's output. However, the

monthly expenses had to be met before returns on brick made could be received. It was therefore necessary for some one to finance the operations by advancing during the month the pay roll and expense of making the brick made during that month. This the appellant bank agreed to do, taking as security for such advances a lien by way of chattel mortgage on the brick in process of manufacture, for the making of which the money was advanced, and while stacked on the yard and until sold. In this financial condition of the bankrupt, it was equally necessary for the bankrupt and its lessee to be assured of disposing of its output by sale, as soon as ready for shipment, so that it could currently reimburse the appellant bank its advances. To accomplish this feature, the bankrupt's lessee sold its output for the period of the lease to the bankrupt, which, in turn, resold it to the appellee for the same period, with the understanding conformed to in practice that bills of sale should be executed for each month's output, and paid for by appellee, out of the proceeds of which payments the bank was to be and was monthly reimbursed its advances. While the appellant may not have known with whom the bankrupt had this arrangement, we have no doubt it knew that such an arrangement existed; otherwise, it would have been unwilling to enter into such an agreement with the bankrupt and its lessee, which otherwise would have been impossible of fulfillment by the bankrupt. Looking at the situation of the parties, and the necessity of leaving the current output of the bankrupt free for its disposition after manufacture, in order to make a workable arrangement for the operation and financing of the business of the bankrupt, we conclude that the appellant bank must have contemplated retention of its lien only until each month's production was sold, and until it was reimbursed out of the proceeds of the sale for the advances it had made on the faith of that month's production. Under this arrangement the appellee took the risk arising from a failure on the part of the bankrupt to pay the appellant's monthly advances from the purchase price of the brick appellee paid the bankrupt. If this was done, the lien of the appellant bank on the brick was released. Appellant took the risk of a failure on the part of the bankrupt's lessee to produce enough brick in any one month to repay it the advances it had made during that month. The taking of this risk by appellant was necessary to the conduct of the business, since, if the lien of appellant continued after the brick were made and the advances of appellant repaid, the bankrupt's power to dispose of them would have been taken away by the continuance of the lien, and its ability to repay the bank would have ceased. The arrangement contemplated a contemporaneous payment of the bank's advances from the proceeds of the sale of the brick, and a cessation of the bank's lien. Otherwise, the agreement would have been unworkable, or would have worked a fraud on appellee, if unaware of the existence or continuance of appellant's lien. The contract should not be construed to have such an effect, unless the language imperatively demands it. Its provisions are far from being clear. We think, however, they may fairly be construed as providing for the security of the bank by giving it a lien on each month's output, for each month's advances, a lien which

was to be satisfied when those advances were repaid to it, thereby vesting in the appellee as purchaser an unincumbered title under his bill of sale to that month's production, though it remained stacked on the brickyard. This construction is the more reasonable in the view we have taken that the record amply shows that the appellant bank was cognizant that the bankrupt and its lessee had made a sale of its output to some purchaser for the six months period of the lease, and must have acquiesced in such a sale, since it afforded the only feasible plan for the bank to be repaid each month the advances made by it for brick made during the month. If the advances were not repaid as provided, the bank was given the right under its contract to possess itself of the plant and complete the making of the unfinished brick. The security of the appellant was evidently on the brick till disposed of. Provision for immediate payment of its advances made longer security unnecessary, and it would have been fatal to the carrying out of the agreement, since it would have prevented the prompt sale of its output, from which source alone the appellant could expect repayment of its advances.

As the record shows that the bank was paid all advances, except what it contributed to the last month's operation, and that it has received all the proceeds of sales of brick made during the last month's operations, and as we conclude its lien on the production of previous months was released by the payment of the advances made by it for those months, we think the District Court rightly ruled that the appellee's title under his bills of sale was superior to that of the appellant under its chattel mortgage, to the extent the referee disallowed the appellant's claim. The execution of the bills of sale operated as a constructive delivery of the brick covered by them and which were stored on the brickyard.

The loss of the appellant is attributable to the risk, which we think it assumed by the terms of its contract, viz. the failure of the bankrupt's lessee to make enough brick during the last month's operation to pay the appellee the amount he had advanced for that month's operation.

The order of the District Court is affirmed.